Good afternoon. May it please the Court. My name is Lauren Cooley and I'm here today on behalf of the appellant, Symetra. I'd like to begin by focusing on the notice issue. And I'd like to raise three reasons why Amy's notice rule would turn the UCC on its head. First, the Texas UCC does not put the burden on Symetra or this Court to untangle the complicated web of creditors here. Symetra has no duty to continually search for creditors of creditors of creditors. The UCC puts that burden on the party in the best position to know, which in this case is the plaintiff creditors. I'll refer to them as Amy for simplicity today. What you're saying is that the requirement is of actual notice and the filing of the UCC-1 is not actual notice. I would explain it a little more. Under Texas law and its interpretation of the UCC, actual notice can include implied notice. So implied notice is part of the story here. But you don't get to implied notice unless there's a duty to go out looking. And you're absolutely right, our position is that simply filing a UCC-1 financing statement does not constitute notice unless there's actually a duty to go look and find that financing statement. And in this case, there are no facts that would have triggered a duty on Symetra's part to go look for that financing statement. It's undisputed that Amy waited almost 10 years to actually notify, to write to Symetra and notify Symetra of its security interests. So the simple solution here would have been to send that letter years earlier. That might have prevented us from having to be here today. But that didn't happen. Do you have a bunch of these cases? There are several of these cases that involve disputes between... Because it seems like an awfully little amount of money for an awfully lot of lawyering. The legal issues in this case do impact other cases, yes. So the notice standard here and what this Court says about what is required to satisfy the UCC notice requirements will have effects in other cases. And it's clear under the cases that we've cited that there's no implied notice without facts. There have to be facts to trigger the duty for Symetra to just go looking to find Amy hiding in the weeds. And I think that I would direct the Court's attention to the Barclays decision, the Texas Court of Appeals decision that we cite in our briefs. It's very similar to this case. There was actually a financing statement filed in that case regarding the security interest that was at issue. And, in fact, an accountant debtor provided an oral notification, was given an oral notification from the assigner to go talk to the assignee. And even that, the Texas Court of Appeals held, was not sufficient as a matter of law to trigger a duty of inquiry or to constitute notice under the Texas UCC. Are cases even stronger than that? And I would also point the Court to the cases on which Amy relies, Speer and Apex and Tempe. In those cases where there was enough evidence to support a notice argument, there were facts far beyond what's at issue in this case. There were specific attempts by the S-Niner or the assignee to contact the account debtor directly and notify them that an assignment had taken place. Maybe that notification wasn't perfect. Maybe there were some errors in the letter or in the conversation. But there was a direct communication, and we have nothing like that at issue in this case that would have been on time to cast aside Symetra's offset rights. Amy kicks up a lot of dust here and suggests that Symetra did have a duty to go out searching for evidence of a security interest. And I think all of that evidence really boils down to evidence that there was a right to assign, that 3B, the predecessor to Amy, another one of the Felvin-affiliated companies, that they, according to these court filings and these transfer applications, that 3B and Rapid had the right to make subsequent assignments. But that is not enough to require Symetra to be the one to conduct searches of who are the creditors of the creditors, what is the infinite going-forward line of subsequent assignees that might be out there in the universe. And I would point the court to other principles in the UCC that really reinforce why that can't be the rule. The default background rule in the UCC is actually that there should be no restrictions on the creation of a security interest or an assignment of that security interest. And that can be found in 9406F. And that provision provides very strong policy against anti-assignment provisions. So the background rule in the UCC is yes, on almost all occasions you do have the right to assign. And yet despite that presumption, there are still these specific notice requirements in the UCC that require the account debtor to receive notification of the subsequent assignment. That's the bargain that the UCC strikes. We're not going to restrict your right to assign, but now you have to tell the account debtor that an assignment has been taken place. And that makes sense because it puts the burden on the party who is in the best position to know this information and can very easily provide that notice to a company like Symetra. I would also point out, as Judge Haynes mentioned, it's not just about these payments. It's also not just about this account debtor. It's not just about Symetra. It's really any creditors, or any account debtors rather, who might have offset rights against subsequent assignees. In addition, it's not just about the line of payments owed to the assignees in the Feldman family. Symetra is making annuity payments on thousands of these kinds of structured settlement payment arrangements. So it's not simply about searching for a UCC-1 in this case. It's about what burden does that create for a party in Symetra's shoes on these other thousands of structured settlement payment obligations. As I mentioned, the UCC requires facts. Under 1.202, notice of a fact means that from all the facts and circumstances known to the person at the time in question, they have reason to know that the fact exists. Again, it ties it back to what are the facts in the account debtor's possession at the time. If all you have to do to satisfy that standard is to file a UCC-1 and for the account debtor to know that there's a right to assign, that would violate the whole intent and purpose behind the notice standards that are contained in the UCC. I believe that Amy also points to what they say are evidence that Symetra was searching for these kinds of statements.  There are instances where Symetra is obligated to go figure out if the original tort beneficiaries, the original beneficiaries of the payments to the tort victims who assigned their rights away, if they've made multiple assignments. So when a company like Rapid or 3B goes to court and asks to transfer their rights, Symetra may look and see if the rights have already been transferred. But that's a very different scenario than what we have here, which is then looking to see once the next party acquires the payments going forward, who else gets those rights down the line. And when you have a scenario like these Feldman-operated entities that are kind of constantly shifting around their interests, constantly assigning rights to the payments or security interests in the payments where that relationship is constantly evolving, you can imagine that this isn't just a one-point-in-time obligation. This is a situation where Symetra is going to have to be continually, continually, continually running these kinds of searches. So our position is as a matter of law, there was not enough evidence for this notice case to go to the jury. Exxon reversed in a case where there wasn't enough evidence and remanded for entry of judgment. Barclays involved facts like ours and an affirmance that there wasn't enough evidence to go to a jury. But even if the court disagrees and thinks there were enough facts of notice to go to a jury, we believe that the jury instructions in this case still require reversal. Symetra's instruction that it proffered mirrors the UCC. Again, from all the facts and circumstances known to the person, there was reason to know that the fact existed. The court's instruction adds additional language that was offered by Amy. Notice means a reasonably diligent inquiry and exercise of the means of information at hand would have disclosed the underlying facts. Amy essentially concedes that that language about a reasonably diligent inquiry presumes that Symetra had a duty to go looking for evidence of an assignment, for evidence of a security interest. Talked about why that can't be the law under the Texas UCC. And the trial court essentially left the jury with the impression that this duty existed as a matter of law. And so the question is, what did they find? What did Symetra find when it had a duty to go looking? But we submit that that took what was at least a fact question for the jury out of the jury's hands. Amy says that the court actually did exactly what it was supposed to do, but the court never found a duty as a matter of law, and as we submit, couldn't have with the evidence as weak as it was here. There's no case law that supports this instruction. There's diligent inquiry of language that you see in, for example, the Spear case about there being a duty to inquire. But in each of those cases, there were predicate facts that clearly put the party on notice. There was some attempt specifically to notify, to contact the account debtor, and that gave rise to enough information for the account debtor to ask more questions. There's nothing like that at issue in this case. Prejudice is established if there is uncertainty over the effect of the error on the outcome. And here, really, Amy's case boiled down to, did Symetra have a duty to go looking for the financing statement? And assuming that the duty existed really weakens our case, and I think that it's difficult to argue there wouldn't be prejudice from such an error. And the jury's note really reinforces the prejudice argument, because the jury asked the court, does the filing of a UCC give notice? That was the jury's question. And as we've discussed, there's really no dispute that that doesn't establish notice unless there's a duty to go looking for it. But the court simply pointed the jury back to the jury instructions, which, again, had this misleading language about there being an inquiry involved. I'd like to spend a couple of minutes also on our arguments about excluded evidence. So if the court concludes there's not enough notice, evidence is a matter of law, that's the end of this appeal, of the consolidated appeals. The judgment should be entered for Symetra, case is over. If not, then there are a couple issues that have to be evaluated for purposes of retrial. One would be the jury instructions, and the other would be the excluded evidence. So fraud and alter ego are difficult to prove, and Texas law allows for circumstantial evidence of various kinds to establish, to give the jury enough information about suspicious facts that indicate a potential fraud. The story that Symetra wanted to tell the jury was that there is a plan here to insulate assets that 3B has, to move them away or to secure them with security interests from other Feldman affiliates in order to prevent other creditors from getting to them. So Symetra wanted to step back and look at the bigger picture of what's happening, where there's a judgment, then there's a transfer. Where there's a threat of litigation, there's a security interest assigned, that these things are happening close in time. But the court really limited what Symetra could talk about. We know that RAPID was violating the State Structured Settlement Protection Acts, that it was facing lawsuits as a consequence of that, that it had no money of its own. We know that 3B was transferring away rights and its assets and assigning security interests. And again, our argument was this was all done to keep money out of other creditors' hands. So I'd like to call attention to a couple of the things that we were not allowed to talk about to show that pattern to the jury. One of the major categories is pending or threatened litigation against 3B in this case. That is one of the badges of fraud under Texas law. And it provides a motive to insulate assets from creditors. In this case, 3B knew that it faced considerable liability. The company that a Washington State court found to be its alter ego had been running around evading State Structured Settlement Payment Acts and was subjecting itself to these judgments from other courts with penalties for having done so. Feldman, however, testified to the jury that 3B faced no threatened litigation when 3B transferred security interests to Amy. In fact, its alter ego, Rapid, had been subject to a lawsuit just days before the security interest was transferred. And later, when these violations are being— we're not allowed to also talk about the violations of the State statutes, but again, these are leading to judgments that imperil the assets of 3B's alter ego, Rapid. We weren't even allowed to tell the jury that Rapid and 3B were found to be alter egos by a court or that the district court in this case found that to be preclusive in our case. These are all pieces of the puzzle, pieces of the story, that show why these entities are doing what they're doing. And we think it would have been very persuasive to rebut the story that Amy was trying to tell, that everything they're doing is above board, that all these entities are distinct, and that our affirmative defenses shouldn't carry the day. I see my time is about expired, and I will save the balance for rebuttal. Yes, you've saved time for rebuttal. Thank you, Ms. White. May it please the Court. First, you've heard from some very experienced appellate practitioners today. It's actually my first oral argument for this Court, and I'm very much looking forward to it. With that, a few issues that I'd like to focus my time on as the appellee. First, the inquiry notice standard, and whether there was sufficient evidence to support the jury's verdict, making all inferences in favor of the verdict. Second, briefly the jury instruction. And then third, some of the excluded evidence about which Symmetra complains on appeal. First, on the notice question, there was sufficient evidence to support the jury's verdict using the deferential standard of review, in which this Court makes inferences in favor of the verdict. And I'm going to focus on the facts and evidence that was admitted at trial. Amy and FinServ offered at trial documents that Symmetra received, including a court order that specifically mentioned assignments and S&Es. There was also expert testimony about what a sophisticated player in the structured settlement and secured lending industries would understand the words assignments and assigns to mean in this context. But isn't that just that they could be assigned? Your Honor, it's both. They could be assigned as part of a securitization. The testimony at trial was also that it's routine and standard in this industry that securitizations are preceded by initial lines of financing that are secured loans. And so when Symmetra is seeing the words assignments and assigns as a matter of usage in the industry, that both refers to future assignments that would occur from a securitization, but also puts... But it is always true, in the absence of the contract saying you can't assign, that something could be assigned, and if that's enough to put them on the duty to go look at the UCC every other week, then basically this rule that you don't have to look at the UCC is... We just throw it out the window. We're basically saying, yeah, you do. And, Your Honor, that's not the evidence in our case. So if... Give me something more specific than just the word assign. Sure. So what Symmetra did when it received these documents, and I'll note that the race application in November 2004, that was actually made, and it says this in the application, on behalf of BRAFIT and its assigns. So it was not just a provision in a contract that says you have a right to assign. But what's important, when Symmetra objected, is that the parties were focused on this. So Symmetra did not just read the transfer agreement and think, oh, this might mean that BRAFIT and 3B could assign it in the future. Instead, Symmetra actually objected and was saying they are going to assign this over and over and over. So Symmetra was focused on this issue. This wasn't simply boilerplate language in any kind of contract. But that's different from having a duty of notice. I'm still struggling to see how there's anything that would make this different from any other case, any other situation, knowing that, and you agree that, the fact that something's filed with the UCC isn't enough to give notice, right? Yes, I agree with that, Your Honor. And yet you are basically saying, yeah, it is in this industry. You better start looking. It's not in this industry, Your Honor. We're not just relying on the fact that it's in this industry. So Symmetra received documents. Yes, that's part of what happens in this industry. Symmetra made objections. And its sworn statements reveal that it took the information it received and read that to mean that securitizations would be occurring and there would be assignments. And then I think what is really the most important point, a piece of evidence that the jury considered and made inferences from, is that when Symmetra received this exact same information in 2006, in the second round of purchasing another half of the MESA payment, it actually went and found a UCC-1 covering a preexisting assignment, so a secured creditor relationship, between the MESA payment and 3B, and that UCC-1 stated that 3B was a secured party with assigns. And so what's most compelling here is what Symmetra did with the information it received. And the jury was entitled to look at all of the evidence together, not just what happens in the industry. And I agree with Your Honor that the rule should not be that if there's an industry practice of there just being assignments all the time, that now creates a duty to inquire. But what we have here is not only documents that Symmetra received, but then what Symmetra did with those documents. And so when we're looking at some of the case law— I mean, if Symmetra looks it up and finds it, then that's actual notice. But I still don't see why that creates a duty, because the fact that I know you might could assign something doesn't tell me you have. And when am I supposed to start looking at the UCC? Every day? Every hour? Is there an app on my phone? Your Honor, Speer is actually instructive on this point. So in Speer, the assignment had not yet occurred. What the evidence was in Speer was that the account debtor had been told there would potentially be two sources of financing, and the account debtor followed up with one of them and not the other. And the Houston Court of Appeals held that that was sufficient evidence to put the account debtor on inquiry notice under the stricter statute 9406. And so the case law, to the extent it addresses this issue where there's a potential right to assign or an assignment that might be coming in the future, the case law actually suggests that that kind of notice, notice of an assignment that will happen in the future, that can trigger inquiry notice under Texas law. Because the Speer case did not involve the account debtor saying, I have already assigned this. The account debtor was saying, I'm going to need to get potential financing from these two sources. And what's similar to Speer in this case, the account debtor took that information and then went and asked questions and actually exercised a duty to inquire, and that's why we point to what Symetra did when it received the exact same information in 2004. I'm sorry, in 2006 that it received in 2004. And so for the case of Symetra sites that articulate the standard such as if mere suspicion isn't enough to trigger a duty to inquire or if it's not enough to incite investigation, that's not enough to trigger a duty to inquire. Here we actually know that the documents and information Symetra had and received excited investigation because when it received that exact same information in 2006, it went and looked and found a UCC disclosing 3B as a secure party with assigns. And so we're not in a situation here where the jury was having to guess at what Symetra knew or what this information told Symetra. Instead, the jury was looking at evidence of what Symetra actually did when it got this information. Now, yes, it was a later date, but the only evidence at trial was that that information was completely identical to the information that Symetra had in 2004. And Symetra didn't offer any witness at trial to contradict this at all. In fact, the only witness that they offered had started at Symetra in December 2005, so after the time period when Symetra received these documents or filed objections in January 2005, and that witness, Ms. Dixon, testified that she was not aware of Symetra ever filing or finding and filing a UCC-1 in the course of her work there when, in fact, Symetra did that in 2006. And so her testimony for the time period that she actually had personal knowledge of was directly contradicted by the exhibits in the record, and the jury was entitled to look at this evidence, weigh the credibility of witnesses, and make reasonable inferences. And that's what the jury did. And all of the cases that are cited both in Symetra's briefing and our briefing make clear that this is a fact-specific inquiry, and there is no bright-line general rule that will guide when inquiry notice exists as a matter of law. It depends on the facts, and that's why a jury decided this case. And what Symetra's really doing is trying to re-argue the inferences on appeal. And the notice standard that Symetra has articulated actually collapses inquiry notice into actual notice. And I agree there have to be facts that trigger a duty to inquire, and the facts are the ones I've covered that we offered into evidence. But what Symetra's saying is it only has a duty to inquire once it has knowledge that an assignment has occurred, and then it's supposed to inquire into the details of the assignment, is how they've articulated the rule. The problem is that under Section 9404, there will be no duty to inquire once you know of the assignment, because that's all you need to know about under Section 9404. You don't need to know who the S&E is. You don't need to know whether it's the assignment of a security interest or an outright sale. All the statute requires is notification of the assignment. And so when Symetra says inquiry notice exists only after Symetra knows of a specific assignment to a specific assignee at that point in time under Section 9404, that is actual notice. And so their rule is unworkable under Section 9404. In addition, SPEER rejects it. And I touched on this a little bit earlier. SPEER is noteworthy because there the account debtor was on notice of assignments that had not yet occurred yet. And the Houston Court of Appeals said inquiry notice required the account debtor to actually inquire into the existence of an assignment, not the details of an assignment. In the Barclays case that Symetra cited, the implied notice argument was not actually made there, and that's in footnote 2. And so that case is an opposite to what happened here, where the implied notice theory was the one that the jury decided. Turning to the jury instruction, as an initial matter, we think that the court could apply plain error review here. Symetra is saying that the jury should have decided whether there was a duty to inquire. It did not articulate that objection at the charge conference. It also did not submit any kind of question to that effect. And the jury instructions that Symetra did tender to the court were not correct, so the court could not have used them. They actually applied the 946 standard, which Symetra does not challenge on appeal, that that standard doesn't apply here. If the court agreed and applied abuse of discretion, the jury charge is still fine as well. And so the standard review is not dispositive here, but we do think plain error applies. The reasonably diligent inquiry instruction is a correct statement of Texas law. It comes straight out of Speer, which is the most on-point case we have on Texas law here. It's also cited by the Eighth Circuit in the Apex and Tempe cases. Symetra proposed in its own charge the reason to no articulation under the UCC, and those two instructions together require the same thing. And so even if for some reason the court were to find that the articulation of the instruction from Speer were not a correct statement of Texas law, there's no harm because the UCC itself builds a duty to inquire into the notice statute, and that's because the definition of notice includes all facts that a person has known, or all facts, excuse me, a person should know, has reason to know, based on the facts and circumstances available to that person in that section 1202A3. And so the jury's note could have come from either instruction, the reason to know or reasonable diligent inquiry. And the reason to no instruction Symetra proposed. Finally, the Coconut Grove case that Symetra cites in its briefing doesn't apply here. The Fifth Circuit made very clear in that opinion that it was not deciding what kind of duty someone has to inquire about information currently in its possession, and that's what this case was about. Moving to the excluded evidence. I'd like to first focus on the actual questions that went to the jury on the scheme as Symetra refers to it. First, whether 3B was an alter ego with Amy, whether FinServ was an alter ego with 3B, and then whether there was a fraudulent transfer in 2003 or 2007. All of the categories of evidence that Symetra complains about being excluded don't actually relate to these three entities or the transfers that Symetra claimed were a fraudulent transfer. For the alter ego finding, there was no question at trial that 3B was subject to Rapid's judgments. Mr. Feldman admitted that in front of the jury, and that was never challenged. And so there was no need to bring up the fact that alter ego existed between 3B and Rapid because it wasn't contested. And the trial proceeded as if Symetra did have a judgment against 3B. The question was whether Symetra can collect on that judgment in the face of secured creditor's rights. And Symetra fails to articulate how the district court abused its discretion in excluding this finding, let alone how it would have been admissible. The lawsuit against Rapid in 2003 is a similar analysis. Symetra is saying because Rapid was sued in 2003, it should have been able to admit that to show fraudulent transfer theory against 3B. Symetra cites no case, though, where alter ego metaphysically makes two companies into one company for all time and all purposes. It's simply a collection device. And we cite the Hart v. Moore and Kern v. Gleason cases for this proposition. And so the fact that Rapid was sued in 2003 is not probative of 3B's fraudulent intent in 2003. And the testimony at trial was that 3B had never heard of Symetra in 2003. And so it could not have had fraudulent intent to defraud Symetra at that time. Rapid's SSBA violations suffer a similar fate. There was no contesting that Rapid has these judgments. Or, I'm sorry, Symetra has these judgments. The reason for the judgments was irrelevant. And once again, Symetra is not explaining how the district court abused its discretion in applying the rules of evidence here. The other categories of evidence, 3B's transfers of disputed payments, the thwarted collection efforts, and Mr. Feldman's bar discipline from years prior, have the same problems on 3B's transfers of the disputed payments. This happened in 2011 and 2012, years after the fraudulent transfer theories that Symetra articulated in this case. And it didn't affect or improve Amy and Finster's security interest in assets. They continue through the transfer unaffected. And that's under the UCC Section 9315A. And so the fact that 3B transferred the payments doesn't change anyone's rights as between Symetra and Amy and Finster. And so is it probative of any kind of fraudulent intent? For the thwarted collection efforts, Symetra never explained exactly what efforts it wanted to offer evidence of. It has no other collection efforts against 3B other than the offset, which it was allowed to discuss at trial. Finally, with Mr. Feldman's bar discipline, the District Court did not abuse its discretion in excluding this evidence under Rules 404 or 608B. His experience as an attorney and businessman in maintaining corporate formalities or running affiliated corporations is wholly distinct from the rules that govern attorney advertising and attorney conflicts of interest. And this kind of evidence is plainly addressed by Rule 608B and is inadmissible. It was also years old. Finally, all of this excluded evidence, even if the District Court erred in excluding some of it, probably would not have changed the outcome at trial on Symetra's defenses. And that's in light of the evidence Amy and Finster have offered to support that it did not have alter ego relationships with 3B, or they did not have alter ego relationships with 3B, and the fact that the security interests weren't fraudulent transfers. Amy and Finster have offered evidence that as captive insurance companies, they have to submit themselves to review by the IRS, which involves hundreds of pages of Amy's relationships with its affiliates, its lending and insurance relationships. It includes audited financial statements and discloses related party transactions. And Mr. Feldman has personally overseen over 40 of these captive insurance applications. It's one of his businesses, is to help companies set these up. And in his experience, the IRS is specifically looking for the same kind of sham or fraudulent interactions, both with loans and insurance, and fraudulent relationships that Symetra claims occurred here. And the IRS approved Amy and Finster as tax-exempt under the insurance code, meaning that none of the documentation of any of the interactions between 3B, Amy and Finster, about which Symetra complains, raised a red flag for the IRS that these loans weren't legitimate or the insurance relations weren't legitimate. Finally, Amy and Finster also offered evidence from a third party, Green Bank, and Mr. Gregory Christman was the witness who testified on behalf of Green Bank. And Green Bank had loaned in 2009 and 2010 $5 million and $10 million to 3B. As part of its due diligence in issuing that loan, it reviewed income statements, balance sheets, and tax returns, and noticed no red flags that suggested that Amy and Finster controlled 3B. This excluded evidence that Symetra complains about on appeal, which addresses RAPID, the relationship between RAPID and 3B, transfers that didn't involve Amy and Finster. None of it controverts any of that evidence that actually addresses 3B, Amy, Finster, their relationships, and the security interest that 3B granted to Amy and Finster. The district court properly applied the law on inquiry notice. It's a fact-intensive issue. And the court looked to see if there was some evidence of Symetra receiving documents, because the statute does require authenticated notice, receiving documents that would have triggered a duty to inquire. There was sufficient evidence, and so the jury decided that question in Amy and Finster's favor. And making all reasonable inferences in favor of the verdict, this court should affirm. The evidence showed what Symetra actually did with the documents it received at a later date, but the same information it had in 2004. And so Symetra cannot now say that this information wasn't sufficient to trigger a duty to inquire when the actions it took in real time suggest just the opposite. The jury weighed that evidence, made reasonable inferences, and evaluated the credibility of the witnesses as the jury was supposed to do. Likewise, the district court did not abuse its discretion in any of the evidentiary rulings. None of that evidence relates to Amy and Finster, their relationship, or their security interests. If the Court has no further questions, nothing further. I thank Ms. White. Ms. Killey for rebuttal. Thank you, Your Honor. First, I'd like to start by talking about some of the cases on notice that my friend on the other side discussed, and then go through some of the evidence that was mentioned. So first, starting with Speer, the argument was made that Speer is like this case, and that in that case the notion that there would eventually be an assignment was enough to prompt a duty to inquire. Looking at Speer itself, here are the facts in Speer. The assigner told the account debtor that they were going to need to get financing from either the ultimate assignee or a bank. But then the assigner did more. It asked the account debtor to issue an invoice and a letter to the assignee, the specific assignee in that case, stating that the payments would designate them as joint payees. That letter was signed by the account debtor on December 16th, I think. On the next day, payment was delivered to the wrong person. The assignment had happened by that point. The account debtor had promised that it would make payment jointly to the ultimate assignee, and it didn't do that. There is nothing like that in the record here. That is completely different from this case, and I'm not sure where the argument comes from in that decision that there was simply some hypothetical assignment in the future that gave rise to notice or a duty to inquire. I think I would also point the Court back to the Barclays case. My friend on the other side said that Barclays had nothing to do with implied notice, that that issue was not a fact issue in the case. And footnote 2, the Court acknowledges that the parties hadn't really raised implied notice themselves, but it still goes on to evaluate implied notice. It articulates the standards that apply under Texas law, and it explains that the duty of inquiry only extends to matters fairly suggested by the facts really known. Mere rumors, vague statements, circumstances that are equivocal are not enough. This is the Court setting forth the legal standards. And it says where circumstances may be equally referred to some other matter, that's not enough to charge with notice. And then it concludes that a statement that the parties should talk to the assignee could have equally meant something else. The same analysis applies here and, in fact, is stronger in our case. A vague reference to potential future subsequent assignees could mean there were or were not eventual assignees. We don't know what that means. And, indeed, the facts aren't established at that point in time because assignments could happen later. Again, this comes back to the right to assign. That isn't enough. I guess it also kind of affects the timing. If I know today that you might assign the contract we just signed, when am I supposed to go look that up? Exactly. Next day, three months later, every day, every month, every year? It's totally open-ended. Because I could go, I could have said, oh, my gosh, you might assign it. I'm going to go look and see if you did. Well, you didn't. Then am I done? You know, it kind of gets back to this reasonable diligence argument we heard earlier. Right. I agree. And I think there's an uncertainty there, too, that is in tension with what the UCC wants for the expectations to be for the parties. In our case, it is true. You have to keep searching. But isn't that true? All inquiry notice? So let me ask this. Is inquiry notice only triggered when, by inquiring, I would have found something out? You need to have facts. It's not enough that if you had inquired, you would have found something. You had to have a reason, a specific fact that made you have the duty to go looking. And the fact that we might have to keep searching every day, every month, and particularly in a case like this where the transfers are continually happening, the fact that that might happen in the future is just a suspicion. It's something vague. It's not concrete enough under the law. And you can draw a line there. And that's why we say this shouldn't have gone to the jury. I can walk through some of the evidence that was discussed as well. It was claimed that your standard for inquiry notice essentially eliminates inquiry notice. So please articulate your standard for inquiry notice that doesn't eliminate it, that doesn't make it the same as actual notice. There have to be facts, specific facts, known to the party that trigger the duty to inquire. That's in the Exxon case. That's in the Barclays case. Okay. And those facts can't include knowing that they can assign. They cannot include the facts that trigger the duty can't simply be that there's a right to assign. That's the background rule in the UCC. That's almost always the case that there's a right to assign. So if that were enough, then there always would be a duty to inquire. So we have right to assign plus. What's the plus? The plus would be in these cases there is some effort made to directly communicate. That's the bare minimum. There's some direct communication that gives you some concrete information that would then lead you to ask questions. Maybe they tell you, maybe they just send a letter that says my interest has been assigned. Maybe it doesn't identify who the assignee is. Is that actual notice under 404? Well, that wouldn't necessarily give you notice of who the assignee is, but that would give you the implied notice that you need to keep looking. Or it could be simply that you're no longer writing me a letter to say I'm no longer the one that's supposed to receive payments. It's generic. It doesn't use the word assignment or security interest. But it makes clear, it directs payments to another party. Maybe you need to follow up to find out what the nature of that interest was. In this case, there was no communication at all. There was nothing. There was a UCC1 statement filed. There were these transfers that gave 3B the right to assign and nothing more. Those transfers had nothing to do with Amy's security interest. Amy wasn't a party, wasn't mentioned. The fact that 3B assigned the rights was not mentioned in these documents, that doesn't appear anywhere. And the notion that because 3B could have assigned its rights, we should have then known to look would dramatically overbroaden implied notice under Texas UCC law. All right. Thank you, Ms. Kelley. Case is under submission. Last case for today, Whitney Bank v. CMI Company.